**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| SHANNON ANGELL and JEREMY FERRO, | : : : | |
| *Plaintiffs*, | : : | Civil Action No. |
| v. | : : | |
| | : | **JURY TRIAL DEMANDED** |
| NATIONAL RAILROAD PASSENGER CORPORATION d/b/a AMTRAK, | : : : | |
| *Defendant*. | : : : | |

**COMPLAINT**

Plaintiffs Shannon Angell and Jeremy Ferro file this Complaint against Defendant National Railroad Passenger Corporation ("Amtrak") and in support thereof allege as follows:

**INTRODUCTION**

1.      Shannon Angell and Jeremy Ferro worked the mechanical desk at Amtrak's Consolidated National Operations Center ("CNOC").

2.      Throughout her tenure Ms. Angell was a devoted and strong performer.  However, as the only woman on the job, she often was treated as an outsider and did not receive the same benefits and opportunities as her male colleagues.

3.      For her night shifts, which were scheduled for twelve (12) hours, Ms. Angell arrived early to discuss critical information from the prior shift, referred to as "turnovers."

4.      Amtrak required, but did not pay for, its mechanical desk workers to give and receive turnovers at the start and end of each shift.  Since her male colleagues were often late, Ms. Angell had to both arrive early and stay later than her scheduled shifts without pay.

5.      With a change in management, and after Ms. Angell complained to her supervisor that she was being singled out to work beyond her scheduled shifts without pay and began recording the time she had to work beyond the scheduled twelve (12) hours (e.g., 10 minutes here, 8 minutes there) to be properly compensated, Amtrak's all-male management team took a series of escalatory adverse actions against her.

6.      First, they forced her to change the shift she had worked since she started nearly two (2) years earlier in 2021, which would disrupt her commuting time, place her on the opposite schedule of her husband, and prevent her from getting the rest she needed for a pre-existing disability.

7.      Then, management refused to engage with her about alternative schedules.  So, Ms. Angell was forced to take medical leave under the Family and Medical Leave Act ("FMLA leave") at 70% pay.

8.      Shortly thereafter, and while Ms. Angell was out on FMLA leave, Amtrak manufactured a sham investigation based on purported time theft for the minutes that Ms. Angell had worked beyond the scheduled 12-hour shifts.

9.      The increasingly severe retaliation Ms. Angell faced culminated in Amtrak terminating her employment on February 6, 2024.

10.     At all relevant times, Jeremy Ferro, who also worked at the mechanical desk at Amtrak's CNOC, was the husband and colleague of Shannon Angell.

11.     Mr. Ferro repeatedly objected to the gender discrimination faced by his wife, participated in and supported his wife while she was subjected to Amtrak's sham investigation, and continued to complain about Ms. Angell's retaliatory firing until he too was fired the following month on March 25, 2024.

12.     Amtrak's actions were blatantly discriminatory, retaliatory, and in violation of federal and state law.

13.     Ms. Angell therefore brings this action for relief under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the American with Disabilities Act Amendments Act, 42 U.S.C. § 12101 *et seq.* ("ADA"); the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"); and the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA").

14.     Mr. Ferro brings his claims for relief in this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*; and the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*[1]

## **PARTIES**

15.     Plaintiff Shannon Angell is a female who resides in Chestertown, Kent County, Maryland.

16.     From December 13, 2021 until February 6, 2024, Ms. Angell worked as an Equipment Maintenance Expeditor, Foreman III, at the mechanical desk for Amtrak's Consolidated National Operations Center in Wilmington, Delaware.

17.     Plaintiff Jeremy Ferro is a male who resides in Chestertown, Kent County, Maryland.

18.     Mr. Ferro started working at Amtrak as a machinist on or about January 4, 2012, in Washington, D.C.  In 2018, Mr. Ferro moved to the CNOC in Wilmington, Delaware and started

---

[1] Ms. Angell and Mr. Ferro also intend to amend the complaint to bring claims under the Delaware Discrimination in Employment Act ("DDEA"), as amended, 19 Del. C. § 710 *et seq.*, and the Delaware Persons with Disabilities Employment Protections Act ("PDEPA"), once the administrative remedies for those claims have been exhausted.

working the mechanical desk as a Foreman III.  Mr. Ferro was promoted to a Shift Supervisor of Asset Management in 2019, and he remained in this position until his employment was terminated on March 25, 2024.

19.    Amtrak's headquarters are located at 1 Massachusetts Avenue NW, Washington, D.C. 20001.  Amtrak is an intercity passenger railroad company, created by Congress and tasked with providing "efficient and effective intercity passenger rail mobility consisting of high-quality service that is trip-time competitive with other intercity travel options."

20.    Amtrak is a federally chartered corporation, operated and managed as a for-profit company, but with the U.S. government as its controlling shareholder. The Amtrak Board of Directors are appointed by the President of the United States and confirmed by the U.S. Senate.

21.    At all material times, Amtrak had more than fifty (50) full-time employees and was an employer withing the meaning of the FLSA, Title VII, the ADA, and the FMLA.

22.    While Amtrak is a government-chartered corporation, it operates as a private company and its employment practices are subject to federal and state wage and anti-discrimination law.

23.    At all material times, Ms. Angell and Mr. Ferro were employees within the meaning of the FLSA, Title VII, the ADA, and the FMLA.

## JURISDICTION, VENUE, AND EXHAUSTION OF ADMINISTRATIVE REMEDIES

24.    This Court has subject matter jurisdiction based on federal question jurisdiction under 28 U.S.C. § 1331, for claims arising under Title VII, the ADA, the FLSA, and the FMLA.

25.    Venue is proper in this district under 28 U.S.C. § 1391(b), because the events giving rise to the cause of action occurred at Amtrak's Consolidated National Operations Center located at 15 South Poplar Street, Wilmington, Delaware 19801, which is in this district.

26.     On July 17, 2024, Ms. Angell timely filed a Charge of Discrimination, Charge No. 17C-2024-00234, with the Equal Employment Opportunity Commission ("EEOC").  Her Charge also was duly filed with the Delaware Department of Labor ("DDOL").

27.     Ms. Angell's Charge stated that she suffered discrimination and retaliation on the basis of sex and disability, and that Amtrak failed to accommodate her.

28.     On January 9, 2026, the EEOC issued Ms. Angell a notice of her right to sue, and this case has been brought within ninety (90) days of receipt of that notice.

29.     Ms. Angell has exhausted her administrative remedies under Title VII and the ADA.

30.     On December 10, 2024, Mr. Ferro timely filed a Charge of Discrimination, Charge No. 17C-2025-00216 with the EEOC.  His Charge also was duly filed with the DDOL.[2]

31.     Mr. Ferro's Charge stated that he suffered retaliation for complaining about, and participating in the investigation related to, the discrimination that Ms. Angell was subjected to on the basis of her gender.

32.     On January 29, 2026, the EEOC issued Mr. Ferro a notice of his right to sue, and this case has been brought within ninety (90) days of receipt of that notice.

33.     Mr. Ferro has exhausted his administrative remedies under Title VII.

[*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.*]

---

[2] Plaintiffs intend to amend the Complaint to add claims under the Delaware Discrimination in Employment Act ("DDEA") and the Delaware Persons with Disabilities Employment Protections Act ("PDEPA") once the state-level administrative remedies have been exhausted.  Such claims are reserved and fall within the Court's supplemental jurisdiction under 28 U.S.C. § 1367(a), because the claims are so related to the federal question claims that they form part of the same case or controversy under Article III of the U.S. Constitution.

## FACTUAL ALLEGATIONS

### Job Background

**PLAINTIFFS WORKED AT AMTRAK'S CONSOLIDATED OPERATIONS CENTER, AND MS. ANGELL WAS EXPECTED TO WORK BEYOND HER SCHEDULED TIME WITHOUT PAY**

34.     Shannon Angell started working at Amtrak in or around December 13, 2021, and was the only woman working the mechanical desk at Amtrak's CNOC.

35.     Ms. Angell's husband Jeremy Ferro began working at the mechanical desk at Amtrak's CNOC in 2018, and was promoted to the role of Shift Supervisor Asset Management in 2019.  As a Shift Supervisor, Mr. Ferro was a salaried employee and not paid on an hourly basis.

36.     Prior to Ms. Angell joining, the mechanical desk was entirely staffed by men, and Mr. Ferro had conversations with Level C4 Management Supervisor of Asset Management Michael Seward on how important it was to hire women to the desk if possible. Mr. Seward subsequently hired Ms. Angell.

37.     The mechanical desk provides 24-hour coverage. To ensure continuity, employees are told to perform a warm handoff in which they summarize any critical issues from the prior shift for the colleagues replacing them. This transition process is referred to as a "turnover." These turnovers generally take between five (5) and fifteen (15) minutes at the end of each shift.

38.     Given that there is an expectation of 24-hour coverage, employees working the mechanical desk cannot leave until they are relieved by the next shift.

39.     Since mechanical employees need to arrive early to receive a turnover and stay until they are relieved by their replacement, they are typically expected to work more than their scheduled 12-hour shift without extra pay.

40.     To the extent employees arrive late, the employees on the preceding shift have to stay late not just to be relieved but also to provide the turnover.

41.     Ms. Angell consistently arrived for her shift a few minutes early to receive a turnover and often had to remain after to cover for her male colleagues who frequently were running late.

42.     As a result, Ms. Angell worked longer than her scheduled 12-hour shift.

43.     Ms. Angell's husband Jeremy Ferro also worked at Amtrak from January 4, 2012 until his termination on March 25, 2024.

44.     At all relevant times, Amtrak was aware that Ms. Angell and Mr. Ferro were married.

45.     Mr. Ferro and Ms. Angell were married in 2015.  In or around 2015, Mr. Ferro informed Amtrak that his marital status changed.

46.     Ms. Angell also included marital status information in her application in 2021, and Mr. Ferro included this information in certificates of compliance he submitted to Amtrak.

47.     Ms. Angell and Mr. Ferro received clearance from Human Resources ("HR") to work on the same shifts together shortly after Ms. Angell started at Amtrak in December 2021.

48.     Ms. Angell and her husband worked together on the same shifts without incident for nearly two (2) years until the Fall of 2023.

**MS. ANGELL BEGINS RECORDING ALL TIME FOR PROPER COMPENSATION.**

49.     On October 4, 2023, Ms. Angell's coworker Justin Lacenski was over thirty (30) minutes late for his shift.  So, Ms. Angell had to remain on the job well past her 12-hour shift.

50.     This was not the first time that Ms. Angell had to remain on her shift longer to cover for her all-male colleagues, as they were often running late without consequence.

51.     After this incident, Ms. Angell informed her manager, Tyrone Beverly, that she was tired of working for free while her male coworkers showed up late and still got paid for their entire scheduled shifts.

52.     She informed Mr. Beverly that moving forward she would enter the time she spent waiting for relief and on turnovers into her timecard, so she would be paid for all her time worked.

53.     Ms. Angell proceeded with entering into her timecard all of her time worked, including turnover time and time spent waiting for her male coworkers to show up to the next shift.

54.     Ms. Angell informed the other Foreman III employees that she was now recording all the time she worked.  No one told Ms. Angell that she should stop doing so.

55.     Ms. Angell thus continued to enter all her time, including turnover and wait time, without incident, and with the knowledge of her colleagues and manager.

### MS. ANGELL IS FORCED TO SWITCH SHIFTS

56.     On or around November 1, 2023, Mr. Beverly had a conversation with Ms. Angell and Mr. Ferro saying that one of them would have to go on a different shift to avoid any conflict of interest between Ms. Angell and Mr. Ferro who held the nominal title of "shift supervisor."

57.     However, the couple had successfully worked the same shifts for nearly two (2) years with HR approval since approximately December 2021, she as a Foreman III, and Mr. Ferro as a shift supervisor.

58.     Amtrak did not intervene to prevent conflicts of interest among Ms. Angell's male colleagues.

59.     For instance, at all times pertinent to this complaint, a male supervisor named Patrick Barnes worked two (2) levels below his brother, Christopher Barnes, who was Assistant Vice President of the Mechanical Division.

8

60.     In this role, Patrick Barnes directly interacted with and was supervised by his brother during his day shifts.

61.     As Ms. Angell's second level supervisor in October 2023, Patrick Barnes received two (2) out-of-turn promotions in the 6-month period leading up to his appointment.

62.     Mr. Barnes was given a raise at the end of 2022 or in early 2023, when the (2) two other shift supervisors (including Ms. Angell's husband Mr. Ferro) were not given raises.

63.     After Mr. Beverly stated that Ms. Angell and Mr. Ferro may need to work separate shifts, Ms. Angell responded that she would have difficulty moving to the dayshift due to health issues because she suffered from chronic pain as well as sleep apnea and requires a significant amount of sleep to prevent flare ups.

64.     Given her 12-hour shift, and the fact that Ms. Angell commuted from Chestertown, Maryland to Wilmington, Delaware, which during rush hours is a 3-hour round-trip, working the day shift would not give her adequate time to get the sleep she needed to prevent flare ups of her medical issues.

65.     Ms. Angell further complained that she believed that the decision to separate her and her husband from working the same shift – ostensibly to avoid a conflict of interest – was a ruse and a pretext for gender discrimination against her.

66.     Because every other shift had a vacancy for the Shift Supervisor/Lead Shift Supervisor position, employees with seniority were given their shift preferences, and Mr. Ferro had seniority, Mr. Ferro offered to move to a different shift instead to accommodate the "conflict of interest."

67.     He also offered to withdraw from consideration for a Lead Shift Supervisor position—for which he had applied but which he had not yet accepted—and even to take a

demotion from his position as Shift Supervisor to become a Foreman III, same as Ms. Angell, if that was what it took to eliminate the manufactured conflict.

68.    Regardless, without any further conversation on the issue, on Ms. Angell's birthday on November 22, 2023, and immediately prior to the Thanksgiving Holidays, Mr. Beverly officially informed Ms. Angell, via a group email, that she would be switched from nightshift to dayshift for "operational purposes."

69.    Although Ms. Angell had previously disclosed to her supervisor that she could not work dayshifts due to her medical issues, there was no interaction on the part of any Amtrak supervisor to understand or provide a reasonable accommodation for her disability.

**MS. ANGELL COMPLAINS OF DISCRIMINATION AND RETALIATION**

70.    Following the November 22, 2023 email, Ms. Angell immediately informed Mr. Beverly (again); her second-level supervisor Matthew Kling; and her third-level supervisor Steven Mackey that she could not work dayshifts because of her ongoing health issues and that she believed the shift change constituted discrimination.

71.    On November 23, 2023, Ms. Angell further reported to Mr. Mackey and to Amtrak's HR that she was being discriminated against based on her gender and that she needed to work night shifts (the shift least desired by employees) as an accommodation for her disability.

72.    Ms. Angell complained that as the only woman, she had a target on her back since new management (Patrick Barnes and Matthew Kling) had taken over and manufactured a conflict of interest between her and her husband to split them up.

73.    Ms. Angell also stated that she feared that she would face retaliation for reaching out to HR, up to and including termination.

74.    She further detailed how her supervisors had ignored her requests for a disability accommodation.

75.    On November 25, 2023, Ms. Angell wrote another detailed email to Mr. Beverly discussing her pre-existing health issues and seeking a reasonable accommodation of remaining on the evening shift.

76.    In it, she explained that she had survived a serious car accident in 2010, in which she was ejected from her car while wearing her seatbelt.  The force of her body against the seatbelt broke each of her lumbar vertebrae, four (4) of her ribs, and collapsed one (1) of her lungs.

77.    Ms. Angell further wrote that as a result, she has constant pain from degenerative disc disease, spinal stenosis, arthritis, bone spurs, four (4) bulging discs, one (1) herniated disc, three (3) misaligned vertebrae, and other issues.  She also informed Mr. Beverly that she suffered from depression and anxiety.

78.    Ms. Angell stated that, in order to manage her pain levels, she had to sleep at least seven (7) hours a night, which she would not be able to do if she had to navigate rush hour traffic to work the 12-hour day shifts (given the distance of her commute from Chestertown, Maryland).

79.    Working during the day would also mean that she would no longer have someone to drive her to work, during which time she would typically rest in the front passenger seat.

80.    With her health issues exacerbated by additional anxiety and stress caused by her supervisors, she had no alternative options to accommodate her.

81.    On November 29, 2023, Ms. Angell again wrote to Mr. Mackey and reiterated both of her concerns about gender and disability discrimination and explaining again that Mr. Ferro would be willing to take the daytime shift instead of her if they needed someone during that time to accommodate her.

82.    Ms. Angell's complaints and requests for accommodation were ignored.

83.     On December 7, 2023, the day she was scheduled to begin day shift work,

Ms. Angell was forced to begin FMLA leave at 70% pay.

84.    Ms. Angell was approved for FMLA leave from December 7, 2023, through February 28, 2024.

85.    That same day that Ms. Angell's FMLA leave commenced, Patrick Barnes circulated an email requiring managers or shift supervisors to sign off on employee time.

86.    Until then, Foreman III positions had signed off on each other's time when no supervisor was available, and Mr. Ferro had signed off on Ms. Angell's time when the two (2) were the only employees working a shift.

87.    Mr. Barnes commenced a sham investigation to claim that Ms. Angell had violated Amtrak policy by entering the time that she worked waiting to be relieved and providing turnovers on each shift.

88.    On December 20, 2023, Ms. Angell received a pay check for just twelve (12) hours of pay for the pay period from November 27, 2023 to December 10, 2023, when she should have been paid for 49 hours and 22 minutes.

89.    After she complained to Mr. Beverly, he claimed that he had resubmitted her time, but she did not get paid until January 5, 2024.  Even then, Mr. Beverly did not submit the last 1 hour and 22 minutes of her time.

90.    On December 24, 2023, Ms. Angell submitted a lengthy complaint to Amtrak's Office of Inspector General highlighting how her male counterparts regularly showed up late, left early, and sometimes even worked for just six (6) to ten (10) hours but were credited for twelve (12) hours of overtime with management knowledge and approval.

91.    In particular, Ms. Angell provided extensive details on how Patrick Barnes and the men he supervised were allowed to choose their schedules, show up when they pleased, and

received credit for overtime and straight time hours they did not work, while she was penalized for entering the few minutes of additional time per shift she had actually worked.

92.    On December 26, 2024, Ms. Angell submitted yet another complaint to the Amtrak Ethics Office detailing how her supervisors had failed to credit her for 1 hour and 22 minutes of time in retaliation for her prior complaints in November and December of gender and disability discrimination, and provided documentation to show that she had been on-site during all of the times that she had entered on her timecard.

93.    Her complaints did not lead to correction in her pay or an accommodation to night shift, nor was there any discipline or consequence for Mr. Barnes or any of her male supervisors or coworkers.

94.    Instead, on December 28, 2024, Ms. Angell received a "Notice of Formal Investigation For Termination" for the turnover and wait time minutes she had entered on her timecard from October 4, 2023 to December 7, 2023.

95.    A hearing was scheduled for January 25, 2023, which she was forced to attend while on FMLA leave.

96.    The one-sided hearing and subsequent decision focused on when Ms. Angell left work, glossed over the fact that she also arrived early, and Mr. Barnes supplied false rationales for why an early arrival time did not indicate that an employee had worked from when she arrived even though Amtrak required employees to arrive early to receive turnovers.

97.    As a result of the retaliatory "investigation" conducted by Mr. Barnes and the subsequent sham Amtrak hearing, Ms. Angell's employment was terminated, effective February 5, 2024, while she was still on FMLA leave.

## MR. FERRO COMPLAINS ABOUT THE DISCRIMINATION AND RETALIATION THAT MS. ANGELL ENDURED

98.    On December 22, 2023, Mr. Ferro was interviewed by Patrick Barnes in connection with the time Mr. Ferro had approved for Ms. Angell that started before or extended past her regular shift times in October and November 2023.

99.    Mr. Ferro explained in the interview that he approved her straight time because her male coworkers left early and showed up late, which was why she had to work the additional time.

100.    On January 5, 2024, Mr. Ferro was at home with his wife when she received a "Notice of Formal Investigation For Termination," and Mr. Ferro became so upset that he experienced a significant health event due to his blood pressure spiking.

101.    Still, he drove into work for his shift so there would be coverage at the mechanical desk, and he called Amtrak's Employee Assistance Program ("EAP") on his way into work to let them know about his rising blood pressure.

102.    While at the desk, his health continued to deteriorate.  He began having a headache on the left side, and his vision became blurry in his left eye.  He again got on the phone with Amtrak's EAP who advised him to go to the hospital, and he did.

103.    He then applied for and was granted intermittent leave under the Family Medical Leave Act by Amtrak's Leave Management, and between January 2024 and March 2024, he took several days of intermittent FMLA leave.

104.    On or around January 17, 2024 and January 24, 2024, Mr. Ferro spoke to Angela Adjekum from Amtrak Human Resources.

105.    Ms. Adjekum asked Mr. Ferro if he approved Ms. Angell's time.

106.    Mr. Ferro responded that he did, with the knowledge of his managers, as he was the only other shift worker available to approve Ms. Angell's time.

14

107.    He explained that Ms. Angell worked additional time beyond her scheduled shift start and end times because the men that they relieved, or who relieved them, would leave early and arrive late.

108.    Ms. Adjekum also asked Mr. Ferro whether Mr. Kling, who was Ms. Angell's second-level manager, had made disparaging remarks about women who worked at Amtrak during a meeting in September 2023.  Mr. Ferro confirmed that occurred and candidly explained.

109.    On January 25, 2024, Mr. Ferro followed up on his phone conversation with Ms. Adjekum by sending her a text message complaining of the time theft his male coworkers had committed in just the few weeks prior.

110.    Rather than investigate the substantial and easily verifiable claims that Mr. Ferro presented of the men working fewer hours than they reported, Amtrak chose instead to focus on penalizing Ms. Angell for logging the actual hours she had worked.

111.    After Ms. Angell was terminated on February 5, 2024, Mr. Ferro continued to vocally protest the discriminatory basis for her firing.

112.    On February 8, 2024, Mr. Ferro wrote an email to his male supervisors including George Hull, Steven Mackey, and Tyrone Beverly stating that Patrick Barnes had lied in the sham hearing Amtrak conducted before firing Ms. Angell and explaining that Mr. Barnes was "one of the worst culprits of stealing time."

113.    On February 19, 2024, Mr. Ferro again emailed his managers and Ms. Adjekum of HR complaining about another instance in which a male colleague showed up late but recorded time for a full 12-hour shift and pointing out the glaring inconsistency between how Ms. Angell was treated compared to her male colleagues

114.    Mr. Kling wrote back, "HR is looking into these allegations. There is no need to continue to monitor the behaviors of your fellow employees as mentioned in your email."

115.    Human Resources never reached out to Mr. Ferro or Ms. Angell for additional information.

116.    From January through March of 2024, Mr. Ferro continued to take intermittent FMLA leave for which he had been approved.

117.    In early or mid-March 2025, Mr. Ferro told Mr. Beverly that Amtrak had fired his wife ostensibly for falsifying time records, but they had not fired Mr. Ferro himself for approving the same time records. He said, "I think it's really weird that she got fired and I didn't."

118.    Mr. Ferro was then fired effective March 25, 2024.

### COUNT I: SEX DISCRIMINATION UNDER TITLE VII
(*Shannon Angell Against Defendant*)

119.    Plaintiffs repeat and incorporate by reference all of the preceding paragraphs of this Complaint, as if set forth at length herein.

120.    Ms. Angell is a female.

121.    At all relevant times, Ms. Angell met Amtrak's legitimate performance expectations as an Equipment Maintenance Expeditor, Foreman III, at the mechanical desk for Amtrak's Consolidated National Operations Center in Wilmington, Delaware.

122.    Ms. Angell's male colleagues were not subjected to the same treatment that Ms. Angell faced.

123.    Ms. Angell was split from her husband and forced into a different work shift through a manufactured conflict of interest because of her sex. Defendant withheld her pay. She then was subjected to a sham investigation and hearing and ultimately fired, again because of her sex.

16

124.   Amtrak showed malice and reckless indifference with respect to Ms. Angell's federally protected rights.

125.   Amtrak therefore has discriminated against Ms. Angell based on her sex in violation of Title VII of the Civil Rights Act of 1964.

### COUNT II: RETALIATION UNDER TITLE VII
*(Shannon Angell and Jeremy Ferro Against Defendant)*

126.   Plaintiffs repeat and incorporates by reference all of the preceding paragraphs of this Complaint, as if set forth at length herein.

127.   Ms. Angell engaged in protected conduct by complaining about gender discrimination, including to her direct supervisor and his supervisors, to Amtrak Human Resources, and to the Office of the Inspector General on numerous occasions from November 2023 through January 2024.

128.   Title VII protects not just those who belong to a protected class, but also those that object to, or participate in an investigation into, discrimination against others based on a protected class.

129.   Mr. Ferro engaged in protected conduct by complaining about the gender discrimination that Ms. Angell suffered to his supervisors and Amtrak Human Resources on multiple occasions from January to March of 2024, and by participating in an investigation by HR.

130.   Amtrak's management, including Ms. Angell's and Mr. Ferro's managers and Amtrak Human Resources, were aware that Ms. Angell and Mr. Ferro raised complaints regarding gender discrimination.

131.   Ms. Angell was subjected to increasingly severe antagonism, including being forced out of the evening shift, withholding payment for time she had worked, being subjected to a manufactured investigation and one-sided hearing, and being fired on February 6, 2024.

132.    Mr. Ferro was fired because he complained that Ms. Angell was discriminated on the basis of her sex.

133.    Amtrak is therefore liable for retaliation against Ms. Angell and Mr. Ferro in violation of Title VII of the Civil Rights Act of 1964.

**COUNT III: FAILURE TO ACCOMMODATE UNDER ADA**
(*Shannon Angell Against Defendant*)

134.    Plaintiffs repeat and incorporate by reference all of the preceding paragraphs of this Complaint, as if set forth at length herein.

135.    Ms. Angell has substantial residual injuries from a car accident, and anxiety and depression, that substantially limit major life activities and qualify as disabilities as defined by the ADA.

136.    Ms. Angell was qualified to perform the essential functions of her job as an Equipment Maintenance Expeditor, Foreman III, with or without reasonable accommodation, and she performed her job to an acceptable level.

137.    Amtrak knew of Ms. Angell's disability, including due to statements she made to her manager and his supervisors, and to Amtrak Human Resources and the Office of the Inspector General, on numerous occasions in November and December of 2023.

138.    Ms. Angell requested an accommodation in the form of seeking to remain on the evening shift that she had worked since starting at Amtrak.

139.    Amtrak failed to reasonably accommodate Ms. Angell and failed to engage in an interactive process regarding what would constitute a reasonable accommodation under the ADA.

140.    Amtrak is therefore liable for discrimination for failure to accommodate under the ADA.

18

## COUNT IV: RETALIATION UNDER ADA
*(Shannon Angell Against Defendant)*

141. Plaintiff repeats and incorporates by reference all of the preceding paragraphs of this Complaint, as if set forth at length herein.

142. Ms. Angell engaged in protected conduct by requesting a reasonable accommodation for her disabilities.

143. Specifically, Ms. Angell requested accommodation to her manager and his supervisors, and to Amtrak Human Resources and the Office of the Inspector General, on numerous occasions in November and December of 2023.

144. Ms. Angell was subjected to increasingly severe antagonism and retaliation, including being subjected to a manufactured investigation, until she was terminated on February 6, 2024.

145. Amtrak retaliated against Ms. Angell because she engaged in protected conduct under the ADA by requesting an accommodation.

146. Amtrak is therefore liable for retaliation against Ms. Angell in violation of the ADA.

## COUNT V: RETALIATION IN VIOLATION OF FLSA
*(Shannon Angell and Jeremy Ferro Against Defendant)*

147. Plaintiffs repeat and incorporate by reference all of the preceding paragraphs of this Complaint, as if set forth at length herein.

148. Section 15(a)(3) of the FLSA states that it is a violation for *any person* to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or

related to this Act, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee."

149.    Ms. Angell engaged in protected activity under the FLSA on numerous occasions from October 2023 through January 2024, including when she complained about not being compensated to her manager for all of the time she worked in October 2023, and in her complaints to Amtrak Ethics Point on December 24, 2023, and December 26, 2023, in which she explained that she was logging all of the time she worked for turnover and waiting for relief.

150.    Amtrak retaliated against Ms. Angell by declining to permit Ms. Angell to return to her evening shift and by terminating her employment on February 6, 2024.

151.    Amtrak retaliated against Ms. Angell because she engaged in protected activity under the FLSA.

152.    Mr. Ferro engaged in protected activity under the FLSA on numerous occasions from January to March of 2024, including in complaints to HR and his supervisors that his wife, Ms. Angell, was terminated for recording the time that she actually worked to ensure she was properly compensated.

153.    Amtrak retaliated against Mr. Ferro by terminating his employment on March 25, 2024.

154.    Amtrak retaliated against Mr. Ferro because he engaged in protected activity under the FLSA.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]*

## COUNT VI: FMLA INTERFERENCE
*(Shannon Angell and Jeremy Ferro Against Defendant)*

155.    Plaintiffs repeat and incorporate by reference all of the preceding paragraphs of this Complaint, as if set forth at length herein.

156.    Amtrak is an employer subject to the FMLA's requirements.

157.    Ms. Angell worked more than 1,250 hours within the calendar year preceding her FMLA leave and was therefore an eligible employee under the FMLA.

158.    Ms. Angell was entitled to FMLA leave.

159.    Amtrak approved Ms. Angell for continuous leave under the FMLA from December 7, 2023 through February 28, 2023.

160.    Amtrak denied Ms. Angell benefits to which she was entitled under the FMLA by forcing her to appear for a hearing while out on FMLA leave and by terminating her employment before the end of her approved FMLA leave.

161.    Mr. Ferro worked more than 1,250 hours within the calendar year preceding his FMLA leave and was therefore an eligible employee under the FMLA.

162.    Mr. Ferro was entitled to FMLA leave.

163.    Amtrak approved Mr. Ferro for intermittent leave under the FMLA for medical issues that began on or about January 5, 2024.

164.    Amtrak denied Mr. Ferro benefits to which he was entitled under the FMLA by terminating his employment on March 25, 2024.

165.    Amtrak therefore interfered with Ms. Angell's and Mr. Ferro's covered leaves in violation of the FMLA.

[*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.*]

21

## COUNT VII: FMLA RETALIATION
(*Shannon Angell and Jeremy Ferro Against Defendant*)

166. Plaintiffs repeat and incorporate by reference all of the preceding paragraphs of this Complaint, as if set forth at length herein.

167. Ms. Angell engaged in protected activity under the FMLA by requesting and taking approved FMLA leave.

168. Amtrak was aware of Ms. Angell's request for leave, and approved continuous FMLA leave from December 7, 2023 through February 28, 2023.

169. Mr. Ferro engaged in protected activity under the FMLA by requesting and taking approved FMLA leave.

170. Amtrak was aware of Mr. Ferro's request for leave, and approved intermittent FMLA leave after his medical event on January 5, 2024.

171. When Ms. Angell started her leave on December 7, 2023, Amtrak conducted a sham investigation, which was followed by a one-sided hearing, and which ultimately led to Ms. Angell being terminated on February 6, 2024.

172. Amtrak terminated Ms. Angell in retaliation for taking FMLA leave.

173. After Mr. Ferro experienced a significant health event on January 5, 2024, when Ms. Angell received her "Notice of Formal Investigation For Termination," he was approved for and began to take FMLA leave on an intermittent basis.

174. As a result of taking FMLA leave, Mr. Ferro faced antagonism and hostility from Amtrak management, and was ultimately terminated on March 25, 2024.

175. Amtrak terminated Mr. Ferro in retaliation for taking FMLA leave.

176. Amtrak therefore retaliated against Ms. Angell and Mr. Ferro in violation of the FMLA.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs Shannon Angell and Jeremy Ferro seek judgment in their

favor, and against Defendant, in the form of:

I.     A declaratory judgment that Defendant's acts have violated Plaintiffs' rights as secured to them by law.

II.    Actual damages, including lost wages and benefits, including retirement benefits and pensions;

III.   Compensatory damages;

IV.    Liquidated damages;

V.     Punitive damages;

VI.    Statutory penalties;

VII.   Attorneys' fees;

VIII.  Litigation costs and interest; and

IX.    Such additional relief as the Court deems just and proper under the circumstances.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury for all issues so triable pursuant to Rule 38 of the Federal

Rules of Civil Procedure.

*[SIGNATURE PAGE FOLLOWS.]*

Respectfully submitted,

**LAROSA & ASSOCIATES LLC**

*/s/ John M. LaRosa*
John M. LaRosa (DE Bar No. 4275)
1225 King Street, Suite 802
Wilmington, Delaware19801-3246
(302) 888-1290 (telephone)
JLR@LaRosaLaw.com


**GOLDSHAW GREENBLATT PIERCE LLC**

Kasturi Sen, *Pro Hac Vice Forthcoming*
John L. Hensler, *Pro Hac Vice Forthcoming*
Two Penn Center, Suite 1230
1500 JFK Boulevard
Philadelphia, PA 19102
(215) 978 -9090
ksen@ggplawfirm.com
JHensler@ggplawfirm.com

*Attorneys for Plaintiff*

Date**:**  February 4, 2026